UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KUSHAWN MILES, #237011,                          Case No. 2:23-cv-31

              Plaintiff,                          Hon. Jane M. Beckering
                                                 U.S. District Judge

    v.

STATE OF MICHIGAN, et al.,

              Defendants.

_____/

## **REPORT AND RECOMMENDATION**

### I.    **Introduction**

This Report and Recommendation (R. & R.) addresses Defendants' motion for summary judgment based on Plaintiff's failure to exhaust his administrative remedies.  (ECF No. 16.)

Plaintiff — state prisoner Kushawn Miles — filed suit pursuant to 42 U.S.C. § 1983 on February 13, 2023.  In his verified complaint, Miles alleged that he has been incarcerated with the Michigan Department of Corrections (MDOC) since 1994.  Miles further alleged that he has a severe allergy to animal dander.  Miles said that the allergy did not cause him problems until 2017, when the MDOC transferred him to a facility with a dog program.  Miles began experiencing severe allergic reactions to the dog dander in the facility, and requested an accommodation related to his allergies.  But MDOC staff allegedly spent the next four years transferring him between facilities with dog programs, to the detriment of his health.  In addition to

his deliberate indifference claims, Miles alleged that MDOC staff discriminated against him based on his allergies and retaliated against him based on his allergy-related complaints.

This Court issued a screening opinion in this case on August 21, 2023.  (ECF No. 9.)  There, the Court determined that in addition to state law claims,[1] Miles's complaint stated the following federal claims: (1) an Eighth Amendment deliberate indifference claim against Prison Counselor (PC) Pancheri for knowingly arranging a transfer that would expose Miles to dog dander; (2) an Eighth Amendment deliberate indifference claim against Warden Schroeder and Deputy Warden (DW) Potila for failing to limit Miles's exposure to dog dander; (3) a First Amendment retaliatory transfer claim against Pancheri; (4) a First Amendment retaliation claim against Schroeder and Potila for denying Miles's ADA request to move to a dog-free housing unit; (5) a Rehabilitation Act (RA) claim against the State of Michigan, MDOC, and Bureau of Health Care Services (BHCS); and (6) an Americans with Disabilities Act (ADA) claim against the State of Michigan, MDOC, and BHCS.  (ECF No. 9, PageID.82-84, 87-91.)

Defendants now move for summary judgment, asserting that Miles did not properly exhaust his administrative remedies.  (ECF No. 16.)  More specifically, Defendants argue that Miles did not pursue any relevant grievances against them through Step III of the MDOC's grievance process.  (ECF No. 17, PageID.121-124.)

---

[1]    Specifically, Miles's complaint asserted violations of Michigan's Persons with Disabilities Civil Rights Act and of Article 1 of the Michigan Constitution.  (ECF No. 1, PageID.12-18.)

In a verified response, Miles argues that: (1) he made sufficient efforts to exhaust his claims against PC Pancheri, but URF staff ultimately rendered the grievance process unavailable to him with respect to those claims; (2) he either successfully exhausted his claims against Warden Schroeder through the grievance process, or the grievance process was unavailable to him because DW Potila threatened to increase his security level if he continued filing grievances and complaints; (3) the grievance process was unavailable to him with respect to his claims against DW Potila because DW Potila threatened to increase his security level if he continued filing grievances and complaints; and (4) either the State of Michigan, MDOC, and BHCS were given sufficient notice of his claims via his grievances, or the grievance process was unavailable to him with respect to his claims against them.  (ECF No. 18, PageID.227-235.)

The undersigned respectfully recommends that the Court deny Defendants' motion for summary judgment based on Miles's failure to exhaust his administrative remedies.  In the undersigned's opinion, there are genuine issues of material fact bearing on the availability of the grievance process with respect to all of Miles's remaining claims.

## II.    Factual Allegations

As set forth in this Court's August 21, 2023 screening opinion, Miles's verified complaint sets forth the following factual allegations:

> On May 5, 1994, Plaintiff came into the MDOC to serve a life sentence. At this point, there were no dog programs at MDOC facilities, and Plaintiff did not have any experience being housed with dogs. In 2017, when Plaintiff was transferred to the Muskegon Correctional Facility

3

(MCF), he discovered that he would be housed at a facility that also housed dogs, and he brought it to the attention of non-party nurses and non-party Medical Provider Dr. Decker.

Once at MCF, Plaintiff began having severe allergic reactions to the dogs, including asthma attacks. This required Plaintiff to receive breathing treatments daily and to be given steroids and restricted allergy medications. On January 19, 2017, Plaintiff had his chronic care visit with his medical provider, who documented Plaintiff's history of allergies. Plaintiff's asthma was classified as "severe persistent." (ECF No. 1, PageID.7.) It was also noted that Plaintiff's asthma was exercise induced, seasonal, and systemic, with a requirement for continuous steroid use, and that aggravating factors included animals. (*Id.*)

On February 7, 2017, Plaintiff was transferred on an emergency basis to the Brooks Correctional Facility (LRF), to help alleviate his allergies and severe asthma attacks. The transfer had to be approved by [former] Defendant Heintriz. In October of 2017, Plaintiff was transferred to URF and was placed on the West Side of the facility. The leader dog program at URF was contained to two units, and Plaintiff was not housed in either of these units. However, Plaintiff had numerous severe allergic reactions and asthma attacks. Plaintiff asserts that yard officers brought dogs into his housing unit, walked around with the dogs, and shook Plaintiff down and searched his property, which exposed Plaintiff to allergens. Plaintiff filed a grievance, which prompted Plaintiff to be moved to the East Side because dogs should not be on that side of the prison.

When Plaintiff was sent to the East Side, "he was ridiculed, criticized, and harassed" by Defendant Pancheri and non-party Prisoner Counselor Salamon about his dog allergies. (*Id.*) Plaintiff states that Defendant Pancheri subjected him to inhumane living conditions and deliberately attempted to impede Plaintiff's access to the courts by interfering with his outgoing mail. While Plaintiff was being housed on the East Side, he filed multiple grievances regarding continued health issues, placing staff and the Director's Office on notice of his serious medical needs. Plaintiff also filed several written and verbal complaints against Defendant Pancheri for harassment and retaliation, and for "making Plaintiff a target" by telling other housing unit officers that Plaintiff was helping other prisoners file complaints. (*Id.*, PageID.8.) In addition, Plaintiff filed a complaint and grievance on Defendant Pancheri for allowing staff to destroy Plaintiff's personal property when Plaintiff was placed in administrative segregation.

4

Plaintiff asserts that in February of 2020, Defendant Pancheri was angry about Plaintiff being elected as the Unit Block Representative for Marquette Unit and told Plaintiff to get his affairs in order because he was going to be transferred to the Alger Correctional Facility (LMF) so that someone else would have to deal with his grievances and complaints. Defendant Pancheri told Plaintiff that he was tired of Plaintiff filing complaints, grievances, and lawsuits against staff, as well as helping other prisoners with their grievances and lawsuits. Plaintiff asked how this could happen when LMF only had one level II unit, which was used for the leader dog program. Defendant Pancheri stated that he did not care, and that if the Lansing Transfer Coordinator approved the transfer, Plaintiff would be someone else's problem.

On February 9, 2020, Plaintiff was told to pack up his property. The next day, Plaintiff was transferred to a level II housing unit at LMF. Plaintiff states that when he arrived at LMF, he informed the SCC that he had a dog allergy. Plaintiff was subsequently assigned to the only level II housing unit at LMF that had dogs, forcing Plaintiff to have daily contact with dog allergens. On February 10 and 11, 2020, Plaintiff had severe allergic reactions as a result of exposure to dog dander and suffered from severe asthma attacks. Health Care staff had Plaintiff quarantined and spread a rumor that Plaintiff had arrived at LMF with the flu. On February 11, 2020, Plaintiff was given a box of Tamiflu and was swabbed to check for the flu virus despite the fact that Plaintiff told staff he was suffering from an allergic reaction.

On February 12, 2020, Plaintiff's flu test came back negative and he was removed from quarantine. Plaintiff filed a grievance regarding his exposure to animal dander. Plaintiff appealed the denial of his grievance to steps II and III, alerting Defendant[] Schroeder and [former Defendant] Washington of his situation. Plaintiff continued to experience allergic reactions to the dogs, and he repeatedly brought these to the attention of unit officers, counselors, the Warden, the Deputy Warden, and Health Care officials. Defendant Schroeder failed to take any action to alleviate the threat to Plaintiff's health.

Plaintiff's restricted allergy medication was increased from 25 mg to 50 mg, and his continuous use of steroids, breathing treatments, and skin creams brought only temporary relief. Plaintiff states the problem was exacerbated by the fact that his clothes and bedding were being washed with clothing and items that were contaminated with dog dander. Plaintiff wrote to his mother on February 19, 2020, prompting her to contact the Office of Legislative Ombudsman, [former] Defendant Washington, Attorney General Allan J. Soros, Warden Catherine

Baughman, State Representative Sara Cambensy, U.S. Congresswoman Brenda Lawrence, State Representative Rose Mary Robinson, and Natalie Holbrook of the American Friends Service Committee. (ECF No. 1, PageID.9; ECF No. 1-9.)

On June 29, 2020, Plaintiff received a JPay letter from Susie Greenbauer of Humanity for Prisoners, responding to Plaintiff's complaint regarding his allergies to dogs and his request to be moved. This letter stated that they had received a message from the BHCS acknowledging Plaintiff's serious medical needs and ongoing respiratory and allergy concerns. On July 2, 2020, Plaintiff filed another grievance on Defendants Schroeder, Health Care Resident Unit Managers, and prisoner counselors. On July 4, 2020, Plaintiff filed a complaint with Health Care, and on July 7, 2020, Plaintiff filed a complaint with Humanity for Prisoners.

On September 1, 2020, Plaintiff filed an ADA reasonable accommodation request, seeking to be placed in a level II housing unit without dogs and to limit his contact with items contaminated with dog dander. On September 2, 2020, Plaintiff's accommodation request was denied by Defendant MDOC and Defendant Potila because "health care did not have [Plaintiff] down for animal allergies." (ECF No. 1, PageID.10.) Defendant Potila denied Plaintiff's appeal on September 7, 2020, telling Plaintiff that he was tired of Plaintiff's complaints and grievances. Plaintiff asserts that despite the fact that Defendants Schroeder and Potila transferred "select[] inmates" during this time period, they refused to grant his request for a transfer. (*Id.*)

Plaintiff states that Defendant Potila threatened to transfer Plaintiff to Level IV if he continued to file grievances and to pursue his ADA appeal. Consequently, Plaintiff feared retaliation and chose not to finish exhausting his administrative remedies. At some unspecified time, Plaintiff spoke with Defendant Schroeder "when she made her rounds to the units regarding Defendant Potila's threat to retaliate against [Plaintiff] and put him in level 4 if he wrote another grievance against [Potila] or pursued his ADA appeal." (*Id.*, PageID.11.) Plaintiff alleges that "Defendant Schroeder told Plaintiff that she too was sick and tired of Plaintiff causing so many problems about the dogs and conditions of confinement and tired of him writing complaints and grievances and having people calling and complaining about him and that she agreed with Defendant Potila." (*Id.*) Plaintiff filed a complaint with the Michigan Department of Civil Rights (ECF Nos. 1-17 and 1-18) that has never been resolved. Plaintiff continued to be housed in the unit with dogs for an additional nine months until he was transferred.

6

Plaintiff's continued ordeal caused him to suffer a mental health breakdown. Plaintiff was placed on psychotropic medications for severe depression and anxiety. On July 21, 2021, Plaintiff was transferred from LMF to the Kinross Correctional Facility (KCF), to be placed in an outpatient program. Upon his arrival at KCF, Defendant MDOC still attempted to place Plaintiff in B Unit, which was a housing unit with dogs. Plaintiff refused to lock in B Unit and was threatened with administrative segregation. Plaintiff was eventually placed in C Unit and his medical provider gave him a Special Accommodation Notice not to be housed in units with animals.

(ECF No. 9, PageID.73-77.)

## III.    Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury[2] or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

---

[2]    If defendants move for summary judgment on the basis of exhaustion under the PLRA, and the court determines that there is a genuine issue of material fact, the issue need not be submitted to a jury. *Lee v. Willey*, 789 F.3d 673, 678 (6th Cir. 2015). Instead, the court may conduct a bench trial to resolve the issue. (*Id.*) In a bench trial on exhaustion, the defendants must show that the plaintiff failed to exhaust his administrative remedies by a preponderance of the evidence. *Id.* at 677 (citing *Jones*, 549 U.S. at 218) ("Failure to exhaust administrative remedies is an affirmative defense, which the defendant has the burden to plead and prove by a preponderance of the evidence."); *Richards v. Perttu*, No. 2:20-CV-76, 2022 WL 842654, at *1 (W.D. Mich. Mar. 22, 2022) (affirming a magistrate judge's ruling that the preponderance of the evidence standard applies in a bench trial on exhaustion).

251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV.    Exhaustion

A prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove. *Jones v. Bock*, 549 U.S. 199, 212-16 (2007). "[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). The Sixth Circuit has repeatedly emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Pursuant to the applicable portion of the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust his available administrative remedies. *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001). A

prisoner must first exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process.  *Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000); *Freeman v. Francis*, 196 F.3d 641, 643 (6th Cir. 1999). To properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules.  *Jones*, 549 U.S. at 218-19; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).  "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'"  *Jones*, 549 U.S. at 218-19.  In rare circumstances, the grievance process will be considered unavailable where officers are unable or consistently unwilling to provide relief, where the exhaustion procedures may provide relief, but no ordinary prisoner can navigate it, or "where prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Ross v. Blake*, 578 U.S. 632, 644 (2016).

"Beyond doubt, Congress enacted [Section] 1997e(a) to reduce the quantity and improve the quality of prisoner suits."  *Porter*, 534 U.S. at 524.  In the Court's view, this objective was achieved in three ways.  First, the exhaustion requirement "afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."  *Id.* at 525.  Second, "the internal review might 'filter out some frivolous claims.'"  *Id.* (quoting *Booth*, 532 U.S. at 737*).*  And third, "adjudication could be facilitated by an administrative record that

clarifies the contours of the controversy." *Id*. When institutions are provided adequate notice as required under the PLRA, the opportunity to address the claims internally furthers the additional goals of limiting judicial interference with prison administration. *Baker v. Vanderark*, 1:07-cv-004, 2007 WL 3244075, *5 (W.D. Mich., Nov. 1, 2007).

Michigan Dept. of Corrections (MDOC) Policy Directive 03.02.130 (effective March 18, 2019) sets forth the applicable grievance procedures for prisoners in MDOC custody at the time relevant to this complaint. Inmates must first attempt to informally resolve a grievable issue within two business days of becoming aware of the issue, unless prevented by circumstances beyond his or her control. *Id*. at ¶ Q. If informal resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted informal resolution. *Id*. at ¶¶ Q, W. The inmate submits the grievance to a designated Grievance Coordinator, who assigns it to a respondent. *Id*. at ¶ W. The Policy Directive also provides the following directions for completing grievance forms: "The issues should be stated briefly but concisely. Information provided is to be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included." *Id*. at ¶ S (emphasis in original).

If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within ten business days of the response, or if no response was received, within ten days after

the response was due.   MDOC Policy Directive 03.02.130 at ¶¶ U, DD.   The respondent at Step II is designated by the policy, *e.g.,* the regional health administrator for medical care grievances. *Id.* at ¶ FF.

If the inmate is still dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III using the same appeal form.  *Id.* at ¶¶ U, HH.  The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due. *Id.*  The Grievance and Appeals Section is the respondent for Step III grievances on behalf of the MDOC director. *Id.* at ¶ II.

When the grievance procedures are not available because the issue presented is non-grievable, exhausting those procedures is not required.  It is well-established that a prisoner "cannot be required to exhaust administrative remedies regarding non-grievable issues." *Figel v. Bouchard*, 89 F. App'x 970, 971 (6th Cir. 2004); *Mays v. Kentucky Dept. of Corrections*, 2018 WL 4603153, at *3 (W.D. Ky. Sept. 25, 2018) ("It is beyond debate that an inmate cannot be required to exhaust administrative remedies regarding non-grievable issues."); *Reeves v. Hobbs*, 2013 WL 5462147 (W.D. Ark. Sept. 3, 2013) ("Defendants cannot treat a complaint as non-grievable, and therefore not subject to the grievance procedure, and then turn around and maintain the claim fails because [the plaintiff] failed to follow the grievance procedure. As the well-known proverb states, they cannot have their cake and eat it too.").  However, when other administrative remedies are available, the prisoner is required to exhaust those remedies prior to filing a federal lawsuit.

11

When prison officials waive enforcement of these procedural rules and instead consider a non-exhausted claim on its merits, a prisoner's failure to comply with those rules will not bar that prisoner's subsequent federal lawsuit. *Reed-Bey v. Pramstaller*, 603 F.3d 322, 325 (6th Cir. 2010).  The Sixth Circuit has explained:

> [A] prisoner ordinarily does not comply with MDOCPD 130—and therefore does not exhaust his administrative remedies under the PLRA—when he does not specify the names of each person from whom he seeks relief.  *See Reed-Bey v. Pramstaller*, 603 F.3d 322, 324-25 (6th Cir. 2010) ("Requiring inmates to exhaust prison remedies in the manner the State provides—by, say, identifying *all* relevant defendants—not only furthers [the PLRA's] objectives, but it also prevents inmates from undermining these goals by intentionally defaulting their claims at each step of the grievance process, prompting unnecessary and wasteful federal litigation process.").  An exception to this rule is that prison officials waive any procedural irregularities in a grievance when they nonetheless address the grievance on the merits.  *See id.* at 325.   We have also explained that the purpose of the PLRA's exhaustion requirement "is to allow prison officials 'a fair opportunity' to address grievances on the merits to correct prison errors that can and should be corrected to create an administrative record for those disputes that eventually end up in court."  *Id.* at 324.

*Mattox v. Edelman*, 851 F.3d 583, 590-91 (6th Cir. 2017).[3]

## V.    Analysis

Miles advances a plethora of arguments in response to Defendants' assertion that he failed to exhaust available administrative remedies based upon his grievance records.  He addresses the exhaustion of his claims against each Defendant in turn,

---

[3]     In *Mattox*, the Sixth Circuit held that a prisoner may only exhaust a claim "where he notifies the relevant prison . . . staff" regarding the specific factual claim "giving the prison staff a fair chance to remedy a prisoner's complaints."  *Id.* at 596.  For example, grieving a doctor about his failure to give cardiac catheterization failed to grieve the claim that the doctor erred by not prescribing Ranexa.

with the exception of his claims against the State of Michigan, MDOC, and BCHS, which he addresses together.  For the sake of clarity, the undersigned does the same.

### a.  PC Pancheri (Deliberate Indifference, Retaliation)

Miles's complaint stated two claims against Defendant PC Pancheri: an Eighth Amendment deliberate indifference claim based on Pancheri's knowing organization of Miles's transfer to a facility where he would be exposed to dog dander, and a First Amendment retaliation claim based on the same transfer.  In response to Defendants' assertion that he failed to exhaust any claims against PC Pancheri, Miles says that he made numerous efforts to file a grievance against Pancheri before and after his transfer to the new facility.  (ECF No. 18, PageID.227-229.)  But Miles says that he was ultimately prevented from exhausting the grievance process with respect to his claims against Pancheri.  (*Id.*)

The Sixth Circuit set forth the framework for an exhaustion analysis when plaintiffs allege that the actions of prison staff rendered their administrative remedies unavailable in *Lamb v. Kendrick*, 52 F.4th 286 (6th Cir. 2022).  There, the Sixth Circuit explained:

> Even if an inmate has evidence to show that an administrative procedure was unavailable, he is not automatically absolved from the PLRA's exhaustion requirement because this Circuit requires inmates to make "affirmative efforts to comply with the administrative procedures before analyzing whether the facility rendered these remedies unavailable." *Lee v. Willey*, 789 F.3d 673, 677 (6th Cir. 2015) (quoting *Napier v. Laurel Cnty.*, 636 F.3d 218, 223 (6th Cir. 2011)). "When a prisoner makes affirmative efforts to comply but does not succeed, we analyze whether those efforts to exhaust were sufficient under the circumstances." *Id.* (quoting [*Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011)]) (internal quotation marks omitted).

*Id.* at 292-93.   Because Defendants bear the burden of pleading and proving a plaintiff's failure to exhaust, "if the plaintiff contends that he was prevented from exhausting his remedies," the defendant must "present evidence showing that the plaintiff's ability to exhaust was not hindered." *Id.* at 295 (quoting *Surles v. Andison*, 678 F.3d 452, 457 n.10 (6th Cir. 2012)).

Miles says that after he was told to pack for his transfer to LMF, he authored a Step I grievance against Pancheri and placed it in the URF Grievance Coordinator's mailbox.  (ECF No. 18, PageID.227.)   Then, after he arrived at LMF, he obtained another Step I grievance to send to the URF Grievance Coordinator.   Miles says that it took him a few days to send the grievance to URF because he began having severe allergic reactions to the dogs in his new housing unit.  (*Id.*, PageID.227-228.)

According to Miles, the URF Grievance Coordinator never responded to either of his grievances.  (*Id.*, PageID.228.)   Miles says that after waiting two weeks for an indication that his grievances were received, he sent the URF Grievance Coordinator a letter.   But Miles says that he never received a response to his letter, either.  (*Id.*) Miles acknowledges that when a prisoner does not receive a response to a Step I grievance, MDOC policy directs them to file a Step II appeal.   But Miles says that he did not even receive a receipt for his grievance with a grievance identification number, which was necessary to file an appeal.  (*Id.*)   Furthermore, Miles says that he would have had to obtain the appeal form from the URF Grievance Coordinator: the same individual who failed to process and respond to his Step I grievances and related communications.   Accordingly, Miles avers that the grievance process was

14

unavailable to him with respect to his claims against PC Pancheri.  (*Id.*, PageID.28-29.)

In reply, Defendants assert that Miles "has not presented any evidence as to the contents of this grievance he purportedly sent from LMF to URF, and has not demonstrated that this grievance, if it had been received and processed by URF, sufficiently exhausted his claims against Pancheri."  (ECF No. 22, PageID.268-269.) Defendants do not argue or otherwise show that Miles did not make the alleged efforts, or that MDOC staff adequately responded to his efforts, such that the grievance process was in fact available.

Contrary to Defendants' assertion, Miles alleges in a sworn statement that he "filled out a Step I Grievance Form against Pancheri and the Transfer Coordinator, for Retaliatory Transfer."  (ECF No. 18, PageID.227.)  In addition, Miles provided a sworn statement from fellow inmate Anthony King, explaining that he watched Miles fill out and submit a Step I grievance "against his PC and Transfer Coordinator." (ECF No. 18-1, PageID.241.)  And Miles's retaliatory transfer claim is predicated on Pancheri's intentional organization of Miles's transfer to a facility where he would be exposed to dogs.  Accordingly, in the undersigned's opinion, there are genuine issues of material fact bearing on whether Miles made sufficient affirmative efforts to exhaust his administrative remedies with respect to his claims against Pancheri, and whether MDOC staff rendered the grievance process unavailable as those claims.

### b. Warden Schroeder (Deliberate Indifference, Retaliation)

Miles's complaint also stated two claims against Defendant Warden Schroeder: an Eighth Amendment deliberate indifference claim for failing to limit Miles's exposure to dog dander, and a First Amendment retaliation claim for denying Miles's ADA request to move to a dog-free housing unit based on his complaints and grievances.  Miles advances two, separate arguments in response to Defendants' assertion that he failed to exhaust his administrative remedies with respect to these claims.  First, he argues that he exhausted his deliberate indifference claim against Warden Schroeder via grievance <u>LMF-20-07-887-3F</u> and <u>LMF-20-02-169-17i</u>, which the MDOC considered on their merits despite any procedural defects.  (ECF No. 18, PageID.229-230.)  Second, he argues that administrative remedies were unavailable to him with respect to his claims against Schroeder because the denial of an ADA accommodation request is non-grievable and because DW Potila threatened Miles should he continue to pursue grievances and complaints related to his dog allergy. (*Id.*, PageID.232.)

### i. Grievance <u>LMF-20-07-887-3F</u>

The undersigned first considers whether Miles's grievance <u>LMF-20-07-887-3F</u> exhausted either of his claims against Warden Schroeder.  The Step I grievance form for grievance <u>LMF-20-07-887-3F</u> reads as follows:

> The complaint is being filed against Warden Schroeder, for being Deliberately Indifferent to my Serious Medical Needs, subjecting me to Emotional and Mental Abuse, Inhumane Conditions of Confinement, and Equal Protection under the Law.  In violation of the 8th Amendment, 14th Amendment, Mich. Const. 1963, art. 1, § 2, 16; PD

03.03.130, Sections (J), (K)(3), (4) and Administrative Rule, R791,718—
Inmate Rights.

On many occasions, I have sent kites to Warden Schroeder and health
care and directly spoken with Warden Schroeder today and every time
she made rounds and informed her and showed her medical
DOCUMENTATION about my SEVERE ASTHMA, CHRONIC
THINITIS AND SINUSITIS; HEAT-RELATED ILLNESS AND
DOCUMENTATION showing that my asthma attacks are triggered by
extreme and excessive heat. I have an Extremely Difficult time
breathing in the "Thick Jean" mask that was issued there is no way to
breathe in this mask, there is no mask air and the mask[s] are super
small and tight on my face and is suffocating me and is
EXACERBATING MY ASTHMA AND ALLERGY CONDITIONS.
Health Care just had me on Steroids to help me breathe and has
DOCUMENTED that the mask[s] are exacerbating my serious condition
and told me that it is okay to wear my "DOO-RAG" as my face mask to
help and allow me to breathe better.  PD 03.03.130(K)(3), states that
staff are Prohibited from ANY ACTIONS CONSCIOUSLY EXPOSING
ME TO [A] SUBSTANTIAL RISK OF SERIOUS HARM AND INJURY
TO MY CURRENT AND FUTURE HEALTH ASND SAFETY, by failing
to take REASONABLE MEASURES TO ABATE THAT RISK.  She is
also allowing her Staff to Substitute their mask that was issued for a
more breathable mask and I am being forced to continue wearing the
mask that is suffocating me which is a violation of the equal protection
and equal treatment clause under the US. CONST. AMEND CIV and
MICH. CONST. 1963, ART 1, § 2.  RESOLUTION: Provide me with a
better and breathable mask or allow me as she has her staff to make a
breathable mask, and file LAWSUIT for DELIEBRATE INDIFFERENE
AND EQUAL PROTECTION VIOLATIONS.

(ECF No. 17-3, PageID.200.)

Miles avers that this grievance exhausted his deliberate indifference claim

against Warden Schroeder because he named her in the grievance and referenced his

"allergy conditions."  (ECF No. 18, PageID.229.)  In fact, Miles contends that he

"complained that they were being deliberately indifferent to his serious medical needs

because of . . . how the poor ventilation system affected his breathing and allergies

because he was breathing in dog dander as well as other environmental allergens."

17

(*Id.*)  In response, Defendants contend that grievance LMF-20-07-887-3F did not mention, and therefore did not put the MDOC on notice of, any deliberate indifference related to his dog allergies.  (ECF No. 22, PageID.269.)

In the undersigned's opinion, Defendants are correct; Miles's grievance LMF-20-07-887-3F did not exhaust his deliberate indifference claim against Warden Schroeder related to his dog allergies.  Nowhere in Miles's Step I grievance did he complain about his dog allergies, or exposure to dog dander.  Nor did Miles request any relief related to his exposure to dog dander.  Furthermore, Miles did not raise the issue of dog dander in his Step II or Step III grievance appeals, despite the fact that the grievance responses contained no mention of dog dander.  (ECF No. 17-3, PageID.197-200.)  The undersigned therefore turns to grievance LMF-20-02-169-17i.

### ii. Grievance LMF-20-02-169-17i

The Step I grievance form for grievance LMF-20-02-169-17i reads as follows:

> I am confined at LMF under conditions that poses a substantial risk of serious harm or injury to my current and future health and safety.  This complaint is being filed because health care and prison officials are deliberately indifferent to my serious medical needs and subjecting me to inhumane conditions of confinement that continues to expose me to unreasonably and substantial risk of harm.  I have well-documented medical history of severe allergies to ("animals") (see medical report, attached), airborne dust, lint, environmental allergens, animal dander, as well as other allergens that is causing [me] to have severe allergic reactions, respiratory and sinus infections, and severe allergies that are potent triggers for my asthma attacks.  From being exposed to the dogs, dog dander and airborne dust, lint, and microorganisms.
>
> I am exposed because custody staff, healthcare staff and inmates play with the dogs and the animal dander is on their bodies.  I have to get my meds, food, shook down [sic] and the dogs are walked around day rooms.

18

I arrived at LMF I have severe allergic reactions from dogs, asthma attacks, sinusitis, rhinitis, respiratory infections, fevers of 100.1 and 101.1 degrees in the 3 days I've been here.

PD 03.03.130(K)(3), states that: staff are prohibited, from any act, or lack of care, whether by willful neglect from significantly impairing the health and safety of any prisoner. When I arrived on 2-10-20 I presented my medical information to staff and medical. That I had serious/severe allergies to animals and health care and custody staff was and is aware of my serious needs not to be exposed to animals and poor ventilation. I am being subjected [to] deliberate indifference. Because custody officials and health care staff knew that I was faced with a substantial risk of harm to my health and has disregarded that risk by failing to take reasonable measures to abate it. As a direct result I am suffering from asthma attacks, allergic reactions, respiratory and sinus infections, high fevers, unnecessary pain and suffering.

PD 04.03.102 states: deficiencies which may threaten the health and welfare of staff or offenders shall be corrected immediately.

Resolution: to be immediately transferred away from the dogs: not to be penalized or retaliated against for this complaint by being "falsely placed in level 4" I am not unmanageable and if I am placed in Level-4 it is by falsifying my security screening. This is my notice to file a 1983 civil action if this issue is not resolved.

(ECF No. 17-3, PageID.215, 218.) The portion of the form dedicated to the prisoner's

attempts to resolve the issue prior to filing the grievance reads:

I've spoken directly to ADW Sprader and RUM, unit officers, and health care nurses on 2-10-20. On 2-11-20 I had severe allergic reaction [sic] to the animals and animal dander. I spoke directly to the nursing staff, housing unit staff, and put a medical kite in the box. On 2-11-20 my allergies and sinus, rhinitis exacerbated my asthma, my temp was (over 100°) coughing green flem.

(*Id.*, PageID.215.)

Grievance LMF-20-02-169-17i was considered on its merits and denied at all

three steps of the grievance process. (*Id.*, PageID.212-215.) Warden Schroeder was

the Step II respondent to the grievance, and construed Miles's complaint as asserting

19

that "staff at LMF are deliberately ignoring [Miles's] condition while placing [Miles] in a housing unit where dogs are present." (*Id.*, PageID.214.)  Schroeder denied Miles's grievance appeal on the grounds that she had conferred with health care staff, and health care staff confirmed that Miles was "receiving treatment for [his] condition and that there is no issue with [his] placement." (*Id.*)

Miles argues that this grievance exhausted his deliberate indifference claim against Warden Schroeder because it was considered and denied at all three steps of the grievance process despite the fact that it named "health care and prison officials" as opposed to particular staff members.  (ECF No. 18, PageID.230.)  In response, Defendants contend that "Schroeder was not named in the grievance and was not the subject of the grievance." (ECF No. 22, PageID.269.)  This, Defendants say, "is underscored by the fact that Schroeder was the Step II respondent" for the grievance, considering that MDOC policy precludes individuals who are involved in the issue being grieved from acting as grievance respondents.  (*Id.* (citing MDOC Policy Directive 03.02.130 at ¶ V).)  Furthermore, Defendants aver that Miles "identified specific individuals at Step I . . . thereby limiting the scope of exhaustion by the grievance to those named at Step I." (*Id.*)

This grievance presents a closer call.  True, Miles did not grieve specific LMF employees in grievance LMF-20-02-169-17i, and the grievance was nevertheless considered and denied on its merits at all three steps of the grievance process.  *See Mattox*, 851 F.3d at 590-91.  However, Miles appeared to be complaining about the custody and healthcare staff who received him upon his transfer and who worked in

his housing unit; the only administrative staff member included in his complaint seemed to be ADW Sprader.  Furthermore, Miles's complaint does not set forth any allegations against Warden Schroeder prior to the filing of grievance <u>LMF-20-02-169-17i</u> on February 12, 2020.  In fact, Miles's first allegation against Schroeder is that she denied the grievance on a later date.  (ECF No. 1, PageID.9.)  And the undersigned agrees that at the very least, Warden Schroeder's participation in the grievance process as the Step II respondent suggests that she did not consider herself a party to the grievance.  Ultimately, it is the undersigned's opinion that grievance <u>LMF-20-02-169-17i</u> did not provide the MDOC with notice of Miles's claims against Warden Schroeder.  Accordingly, it is the undersigned's opinion that grievance <u>LMF-20-02-169-17i</u> did not serve to exhaust Miles's claims against Warden Schroeder.  The undersigned therefore turns to Miles's allegations of thwarting.

### iii.  Allegations of Thwarting

In his verified complaint, Miles alleged that the actions of DW Potila rendered the grievance process unavailable with respect to his allergy-related claims.  (ECF No. 1, PageID.10.)  Specifically, Miles alleged that after his request for an ADA accommodation was denied, he filed an appeal.  (ECF No. 1, PageID.10.)  But Miles says that DW Potila "personally called [Miles] out and told him that he was sick and tired of [Miles] filing complaints and grievances complaining about his allergies to dogs . . . ." (*Id.*)  Potila then allegedly threatened to raise Miles's security level from level 2 to level 4 if Miles continued to pursue his appeal or grievances.  (*Id.*)  And when Miles informed Warden Schroeder of his encounter with DW Potila, she

allegedly told Miles that she was also sick of him "causing so many problems about the dogs" and that she agreed with Potila.  (*Id.*, PageID.11.)

Defendants addressed Miles's thwarting allegations in their initial brief. There, Defendants argued that Miles's allegations of thwarting were undermined by his grievance records, which show that Miles filed numerous grievances before and after the events giving rise to his claims.  (ECF No. 17, PageID.123.)  Defendants relied on this Court's decision in *Sango v. Eubanks*, No. 2:20-CV-160, 2021 WL 2217372 (W.D. Mich. June 2, 2021), *aff'd sub nom. Sango v. Fleury*, No. 21-2597, 2022 WL 2163519 (6th Cir. May 4, 2022), to support that argument.  In response, Miles argues that the fact that he utilized the grievance process with respect to unrelated matters does not undermine his claim that DW Potila thwarted his use of the grievance process with respect to the allergy-related claims at issue.  (ECF No. 18, PageID.231.)  Further, Miles notes that under MDOC policy, a decision on an ADA accommodation request is non-grievable.  (*Id.*)  In the undersigned's opinion, there are genuine issues of material fact with respect to the availability of the grievance process under the circumstances presented.

Defendants rely on the Court's decision in *Sango*.  (ECF No. 17, PageID.123; ECF No. 22, PageID.270.)  They further point out that in a memorandum dated September 2, 2020, DW Potila actually recommended that Sango file a grievance regarding his medical issues.  (ECF No. 22, PageID.270.)  But in *Sango*, the plaintiff alleged that defendants intimidated him from filing grievances despite the fact that he filed numerous grievances against the same defendants following the alleged

intimidation.  *Sango*, 2021 WL 2217372, at *2.  And the plaintiff's allegation of thwarting was not made under oath.  *Id.* at *3.  Additionally, the Court noted that "it may be theoretically true" that a prisoner could feel free to pursue grievances on some issues, but not others, but that the "reality" of Sango's case left "no disputed issue of fact on availability." *Id.* at *2.  The facts of this case are distinguishable.  Miles alleges in a verified statement that on September 8, 2020, DW Potila specifically threatened him in relation to complaints involving his dog allergies.  Miles alleges in another verified statement that the grievances he filed thereafter were unrelated to his allergies (ECF No. 18, PageID.232), and Defendants do not contend let alone establish otherwise. Nor do Defendants address Miles's assertion that decisions on ADA accommodation requests are non-grievable.   Accordingly, in the undersigned's opinion, a reasonable jury could determine that Potila rendered the grievance process unavailable with respect to claims related to Miles's dog allergies, including his claims against Warden Schroeder.

### c.  DW Potila (Deliberate Indifference, Retaliation)

Miles's complaint stated the same two claims against DW Potila as against Warden Schroeder: an Eighth Amendment deliberate indifference claim for failing to limit Miles's exposure to dog dander, and a First Amendment retaliation claim for denying Miles's ADA request to move to a dog-free housing unit based on his complaints and grievances.  With respect to DW Polita, Miles does not aver that he exhausted any of his claims via the grievance process; Miles solely avers that DW Polita's threats rendered the grievance process unavailable with respect to his

deliberate indifference and retaliation claims. (ECF No. 18, PageID.231-232.) For the same reasons stated above with respect to Warden Schroeder, it is the undersigned's opinion that there are genuine issues of material fact bearing on the availability of the grievance process with respect to Miles's allergy-related claims against DW Potila.

### d. State of Michigan, MDOC, and BCHS (ADA, RA)

Miles's complaint finally asserts two claims against the State of Michigan, MDOC, and BHCS: violations of the ADA and the RA. In response to Defendants' contention that Miles failed to exhaust these claims through the grievance process, Miles avers that his grievances and other complaints put them on sufficient notice of his claims, and that the MDOC does not have a grievance procedure for claims against the State of Michigan, MDOC, or BHCS. (*Id.*, PageID.233, 235.) He also reiterates that DW Polita intimidated him from filing grievances relating to his allergies or appealing his ADA request for an accommodation. (*Id.*, PageID.234.)

As an initial matter, the undersigned notes that the Sixth Circuit has rejected the proposition that the MDOC grievance process is generally unavailable for institutional actors. *See Kitchen v. Snyder*, No. 20-1936, 2021 WL 4470032, at *3-4 (6th Cir. June 23, 2021). In *Kitchen v. Snyder*, the plaintiff alleged that the grievance process was unavailable to exhaust his claims against Corizon (the healthcare company responsible for providing care in MDOC prisons at the time). *Id.* The plaintiff pointed to various provisions of MDOC Policy Directive 03.02.130 that reference "individuals" or "staff members" but the court was unpersuaded, noting

that the plaintiff "d[id] not identify any section of the grievance policy that specifically forbids him from filing a grievance against Corizon or its representatives" when his complaints concern unsatisfactory conditions of confinement. *Id.* at *4. Likewise, Miles does not point to any provision of the MDOC grievance policy generally forbidding him from exhausting claims against the State of Michigan, MDOC, or BHCS. *But see Annabel v. Mich. Dep't of Corr.,* No. 1:18-CV-914, 2020 WL 919700, at *1 (W.D. Mich. Feb. 26, 2020) ("The MDOC prison grievance policy directive does not explicitly address whether a grievance can be filed against the MDOC."); *Sedore v. Landfair,* No. 2:22-CV-10060, 2022 WL 17751439, at *6 (E.D. Mich. Aug. 22, 2022) (denying the MDOC's exhaustion-based motion for summary judgment because its argument that it was not named in any grievances did not "carry the day"), *R. & R. adopted,* No. 2:22-CV-10060, 2022 WL 17730733 (E.D. Mich. Dec. 16, 2022).

However, Miles did point to a provision of another policy, MDOC Policy Directive 04.06.155 at ¶ T, which specifically provides that "[a]n offender cannot grieve a final determination [on a reasonable accommodation appeal]." Granted, Miles did not appeal the denial of his accommodation request such that he received a final determination. But again, Miles alleges that the reason he did not appeal the denial of his request is that DW Potila threatened to increase Miles's security level if he appealed or otherwise continued to complain about his exposure to dogs. And Defendants did not address MDOC Policy Directive 04.06.155. To reiterate, a prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove. *Jones,* 549 U.S. at 212-16.

In sum, it is the undersigned's opinion that there are genuine issues of material fact bearing on whether there were administrative remedies available to exhaust Miles's claims.  With respect to Miles's claims against PC Pancheri, the issue is whether he took sufficient affirmative actions to exhaust the grievance process but was unable to do so due to a lack of staff response.  With respect to Miles's claims against Warden Schroeder, DW Potila, the State of Michigan, MDOC, and BHCS, the issue is whether DW Potila's threats to increase Miles's security level rendered the relevant administrative remedy unavailable.

## VI.    Recommendation

The undersigned respectfully recommends that the Court deny Defendants' motion for summary judgment based on Miles's failure to exhaust his administrative remedies.  (ECF No. 16.)  In the undersigned's opinion, there are genuine issues of material fact bearing on the availability of the grievance process with respect to all of Miles's remaining claims.

Dated:  February 20, 2024                              /s/ *Maarten Vermaat*
                                                                    MAARTEN VERMAAT
                                                                    U. S. MAGISTRATE JUDGE

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).