UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KUSHAWN S. MILES #237011,

    Plaintiff,

v.

STATE OF MICHIGAN, et al.,

    Defendants.

_____/

Case No. 2:23-cv-00031

Hon. Jane M. Beckering
U.S. District Judge

## REPORT AND RECOMMENDATION

### I. Introduction

This Report and Recommendation (R&R) addresses the Defendants' motion for summary judgment (ECF No. 33).

Plaintiff — state prisoner Kushawn Miles — filed suit pursuant to 42 U.S.C. § 1983 on February 13, 2023. Miles has been incarcerated in Michigan Department of Corrections (MDOC) prisons for more than 30 years. In his verified complaint, Miles alleged that he has a severe allergy to animal dander. Miles said that the allergy did not cause him problems until 2017, when the MDOC transferred him to a facility with a dog program. Miles began experiencing severe allergic reactions to the dog dander in the facility and requested accommodation related to his allergies. But MDOC staff allegedly spent the next four years transferring him between facilities with dog programs, to the detriment of his health. In addition to his deliberate indifference claims, Miles alleged that MDOC staff discriminated against

him based on his allergies and retaliated against him based on his allergy-related complaints.

This Court issued a screening opinion in this case on August 21, 2023. (ECF No. 9.) The Court found that Miles's complaint stated the following federal claims:

- an Eighth Amendment deliberate indifference claim against Prison Counselor (PC) Pancheri for knowingly arranging a transfer that would expose Miles to dog dander;
- an Eighth Amendment deliberate indifference claim against Warden Schroeder and Deputy Warden (DW) Potila for failing to limit Miles's exposure to dog dander;
- a First Amendment retaliatory transfer claim against Pancheri;
- a First Amendment retaliation claim against Schroeder and Potila for denying Miles's ADA request to move to a dog-free housing unit;
- a Rehabilitation Act (RA) claim against the State of Michigan, MDOC, and Bureau of Health Care Services (BHCS); and
- an Americans with Disabilities Act (ADA) claim against the State of Michigan, MDOC, and BHCS.

(ECF No. 9, PageID.82-84, 87-91.)

In addition, the Court determined that Miles's state law claims asserting violations of Michigan's Persons with Disabilities Civil Rights Act and of Article 1 of the Michigan Constitution remain in the case. (ECF No. 1, PageID.12-18.)

2

On March 20, 2024, the Court denied the Defendants' motion for summary judgment on the issue of exhaustion of administrative remedies. (ECF No. 24.)

Defendants now assert that they are entitled to summary judgment because no genuine issue of material fact exists on any of the issues or claims asserted in Miles's complaint. In the opinion of the undersigned, no genuine issue of material fact exists on Miles's First Amendment retaliation, Eighth Amendment, and ADA and RA claims. It is respectfully recommended that the Court grant Defendants' motion for summary judgment and further decline to exercise supplemental jurisdiction over Miles's state law claims.

## II. Factual Allegations

As set forth in this Court's August 21, 2023 screening opinion, Miles's verified complaint sets forth the following factual allegations:

> On May 5, 1994, Plaintiff came into the MDOC to serve a life sentence. At this point, there were no dog programs at MDOC facilities, and Plaintiff did not have any experience being housed with dogs. In 2017, when Plaintiff was transferred to the Muskegon Correctional Facility (MCF), he discovered that he would be housed at a facility that also housed dogs, and he brought it to the attention of non-party nurses and non-party Medical Provider Dr. Decker.
>
> Once at MCF, Plaintiff began having severe allergic reactions to the dogs, including asthma attacks. This required Plaintiff to receive breathing treatments daily and to be given steroids and restricted allergy medications. On January 19, 2017, Plaintiff had his chronic care visit with his medical provider, who documented Plaintiff's history of allergies. Plaintiff's asthma was classified as "severe persistent." (ECF No. 1, PageID.7.) It was also noted that Plaintiff's asthma was exercise induced, seasonal, and systemic, with a requirement for continuous steroid use, and that aggravating factors included animals. (*Id.*)
>
> On February 7, 2017, Plaintiff was transferred on an emergency basis to the Brooks Correctional Facility (LRF), to help alleviate his allergies

3

and severe asthma attacks. The transfer had to be approved by [former] Defendant Heintriz. In October of 2017, Plaintiff was transferred to URF and was placed on the West Side of the facility. The leader dog program at URF was contained to two units, and Plaintiff was not housed in either of these units. However, Plaintiff had numerous severe allergic reactions and asthma attacks. Plaintiff asserts that yard officers brought dogs into his housing unit, walked around with the dogs, and shook Plaintiff down and searched his property, which exposed Plaintiff to allergens. Plaintiff filed a grievance, which prompted Plaintiff to be moved to the East Side because dogs should not be on that side of the prison.

When Plaintiff was sent to the East Side, "he was ridiculed, criticized, and harassed" by Defendant Pancheri and non-party Prisoner Counselor Salamon about his dog allergies. (*Id.*) Plaintiff states that Defendant Pancheri subjected him to inhumane living conditions and deliberately attempted to impede Plaintiff's access to the courts by interfering with his outgoing mail. While Plaintiff was being housed on the East Side, he filed multiple grievances regarding continued health issues, placing staff and the Director's Office on notice of his serious medical needs. Plaintiff also filed several written and verbal complaints against Defendant Pancheri for harassment and retaliation, and for "making Plaintiff a target" by telling other housing unit officers that Plaintiff was helping other prisoners file complaints. (*Id.*, PageID.8.) In addition, Plaintiff filed a complaint and grievance on Defendant Pancheri for allowing staff to destroy Plaintiff's personal property when Plaintiff was placed in administrative segregation.

Plaintiff asserts that in February of 2020, Defendant Pancheri was angry about Plaintiff being elected as the Unit Block Representative for Marquette Unit and told Plaintiff to get his affairs in order because he was going to be transferred to the Alger Correctional Facility (LMF) so that someone else would have to deal with his grievances and complaints. Defendant Pancheri told Plaintiff that he was tired of Plaintiff filing complaints, grievances, and lawsuits against staff, as well as helping other prisoners with their grievances and lawsuits. Plaintiff asked how this could happen when LMF only had one level II unit, which was used for the leader dog program. Defendant Pancheri stated that he did not care, and that if the Lansing Transfer Coordinator approved the transfer, Plaintiff would be someone else's problem.

On February 9, 2020, Plaintiff was told to pack up his property. The next day, Plaintiff was transferred to a level II housing unit at LMF. Plaintiff states that when he arrived at LMF, he informed the SCC that he had a

4

dog allergy. Plaintiff was subsequently assigned to the only level II housing unit at LMF that had dogs, forcing Plaintiff to have daily contact with dog allergens. On February 10 and 11, 2020, Plaintiff had severe allergic reactions as a result of exposure to dog dander and suffered from severe asthma attacks. Health Care staff had Plaintiff quarantined and spread a rumor that Plaintiff had arrived at LMF with the flu. On February 11, 2020, Plaintiff was given a box of Tamiflu and was swabbed to check for the flu virus despite the fact that Plaintiff told staff he was suffering from an allergic reaction.

On February 12, 2020, Plaintiff's flu test came back negative and he was removed from quarantine. Plaintiff filed a grievance regarding his exposure to animal dander. Plaintiff appealed the denial of his grievance to steps II and III, alerting Defendant[] Schroeder and [former Defendant] Washington of his situation. Plaintiff continued to experience allergic reactions to the dogs, and he repeatedly brought these to the attention of unit officers, counselors, the Warden, the Deputy Warden, and Health Care officials. Defendant Schroeder failed to take any action to alleviate the threat to Plaintiff's health.

Plaintiff's restricted allergy medication was increased from 25 mg to 50 mg, and his continuous use of steroids, breathing treatments, and skin creams brought only temporary relief. Plaintiff states the problem was exacerbated by the fact that his clothes and bedding were being washed with clothing and items that were contaminated with dog dander. Plaintiff wrote to his mother on February 19, 2020, prompting her to contact the Office of Legislative Ombudsman, [former] Defendant Washington, Attorney General Allan J. Soros, Warden Catherine Baughman, State Representative Sara Cambensy, U.S. Congresswoman Brenda Lawrence, State Representative Rose Mary Robinson, and Natalie Holbrook of the American Friends Service Committee. (ECF No. 1, PageID.9; ECF No. 1-9.)

On June 29, 2020, Plaintiff received a JPay letter from Susie Greenbauer of Humanity for Prisoners, responding to Plaintiff's complaint regarding his allergies to dogs and his request to be moved. This letter stated that they had received a message from the BHCS acknowledging Plaintiff's serious medical needs and ongoing respiratory and allergy concerns. On July 2, 2020, Plaintiff filed another grievance on Defendants Schroeder, Health Care Resident Unit Managers, and prisoner counselors. On July 4, 2020, Plaintiff filed a complaint with Health Care, and on July 7, 2020, Plaintiff filed a complaint with Humanity for Prisoners.

5

> On September 1, 2020, Plaintiff filed an ADA reasonable accommodation request, seeking to be placed in a level II housing unit without dogs and to limit his contact with items contaminated with dog dander. On September 2, 2020, Plaintiff's accommodation request was denied by Defendant MDOC and Defendant Potila because "health care did not have [Plaintiff] down for animal allergies." (ECF No. 1, PageID.10.) Defendant Potila denied Plaintiff's appeal on September 7, 2020, telling Plaintiff that he was tired of Plaintiff's complaints and grievances. Plaintiff asserts that despite the fact that Defendants Schroeder and Potila transferred "select[] inmates" during this time period, they refused to grant his request for a transfer. (*Id.*)
>
> Plaintiff states that Defendant Potila threatened to transfer Plaintiff to Level IV if he continued to file grievances and to pursue his ADA appeal. Consequently, Plaintiff feared retaliation and chose not to finish exhausting his administrative remedies. At some unspecified time, Plaintiff spoke with Defendant Schroeder "when she made her rounds to the units regarding Defendant Potila's threat to retaliate against [Plaintiff] and put him in level 4 if he wrote another grievance against [Potila] or pursued his ADA appeal." (*Id.*, PageID.11.) Plaintiff alleges that "Defendant Schroeder told Plaintiff that she too was sick and tired of Plaintiff causing so many problems about the dogs and conditions of confinement and tired of him writing complaints and grievances and having people calling and complaining about him and that she agreed with Defendant Potila." (*Id.*) Plaintiff filed a complaint with the Michigan Department of Civil Rights (ECF Nos. 1-17 and 1-18) that has never been resolved. Plaintiff continued to be housed in the unit with dogs for an additional nine months until he was transferred.
>
> Plaintiff's continued ordeal caused him to suffer a mental health breakdown. Plaintiff was placed on psychotropic medications for severe depression and anxiety. On July 21, 2021, Plaintiff was transferred from LMF to the Kinross Correctional Facility (KCF), to be placed in an outpatient program. Upon his arrival at KCF, Defendant MDOC still attempted to place Plaintiff in B Unit, which was a housing unit with dogs. Plaintiff refused to lock in B Unit and was threatened with administrative segregation. Plaintiff was eventually placed in C Unit and his medical provider gave him a Special Accommodation Notice not to be housed in units with animals.

(ECF No. 9, PageID.73-77.)

### III. Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

### IV. Retaliation

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to establish a First Amendment retaliation claim, a plaintiff must show that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated by the protected conduct. *Id.* To prevail on a retaliation claim, retaliatory motive "must be a 'but-for' cause [of the

injury], meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1721 (2019).

Defendants argue that Miles cannot establish, the second element, that a Defendant took adverse conduct against him. To establish the second element of a retaliation claim, a prisoner-plaintiff must show an adverse action by a prison official that would be sufficient to deter a person of ordinary firmness from exercising his constitutional rights. *Thaddeus-X*, 175 F.3d at 396. The adverseness inquiry is an objective one and does not depend on how a particular plaintiff reacted. The relevant question is whether the defendants' conduct is "capable of deterring a person of ordinary firmness;" the plaintiff need not show actual deterrence. *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002).

### a. Defendant PC Pancheri

Defendant PC Pancheri argues that he did not take adverse action against Miles for two reasons. First, PC Pancheri attests that he has no authority to transfer a prisoner and has no say in where a prisoner is transferred and housed. PC Pancheri stated that "I did not have the authority to transfer prisoners. Nor did I have the authority to determine where the MDOC would transfer a prisoner. (ECF No. 34-4, PageID.366 (Pancheri affidavit).) Departmental Technician/Transfer Coordinator Peterson attested that she prepared the order to transfer Miles to LMF on February 10, 2020, "to accommodate bedspace needs." (ECF No. 34-7, PageID.377 (Peterson affidavit).) She further attested that "[t]hese types of one-to-one transfers are common" and that the transfer did not increase Miles Level II

8

security. (*Id.*, PageID.377-378.) Peterson states that "Pancheri did not select Miles for transfer" and he "did not have the authority to transfer Miles." (*Id.*, PageID.378.) The only involvement that Pancheri had with Miles was the routine preparation of a security classification screen, which he is required to prepare for any prisoner who was going to be transferred to a new facility. (*Id.*)

Second, PC Pancheri asserts that Miles's transfer from URF to LMF was not an adverse action capable of supporting a prisoner's claim of retaliation. The Sixth Circuit has held that a prisoner who was transferred to another prison could not establish adverse action because a prisoner has no interest in being housed at a particular prison. *Colvin v. Foy*, 2015 WL 13927277, *2 (6th Cir., June 18, 2015). As stated above, "an adverse action is one that would 'deter a person of ordinary firmness' from the exercise of the right at stake." *Thaddeus–X*, 175 F.3d at 396 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)). The Sixth Circuit has stated that "[s]ince transfers are common among prisons, ordinarily a transfer would not deter a prisoner of ordinary firmness from continuing to engage in protected conduct." *Siggers-El v. Barlow*, 412 F.3d 693, 701-02 (6th Cir. 2005) (citing *Smith v. Yarrow*, 78 F. App'x. 529, 543-44 (6th Cir. 2003)). But a limited exception applies when there are foreseeable consequences to the transfer that interfere with the prisoner's ability to access the courts. *Id.* at 702.

In the opinion of the undersigned, Miles cannot show adverse action was taken against him by Defendant PC Pancheri because Pancheri had no authority to transfer Miles and had no input in where Miles would be transferred. More importantly,

9

because Miles cannot show that his ability to access the courts was affected by his transfer from URF to LMF, no adverse action was taken against him due to his routine transfer for bedspace purposes.[1]

### b. Defendants DW Potila and Warden Schroeder

Defendants DW Potila and Warden Schroeder argue that they did not take adverse action against Miles because medical personnel confirmed that Miles was appropriately placed and did not require a transfer to a different unit or facility. Miles argues that DW Potila and Warden Schroeder should have transferred him from LMF to a facility that did not have dogs, but they instead threatened him with placement in a higher security level if he did not stop filing grievances. The Sixth Circuit has held "that a prison transfer or the threat of a transfer can be an adverse action if that transfer would result in foreseeable, negative consequences to the particular prisoner." *Hill v. Lappin*, 630 F.3d 468, 474 (6th Cir. 2010). DW Potila states that he never threatened Miles, but instead informed him that if he received a

---

[1] Miles argues that PC Pancheri wanted him transferred to a different facility because Miles filed too many grievances. Even if that were true, the Sixth Circuit has held a prisoner could legitimately be transferred in order "to give prison staff a respite from his continuous barrage of grievances" because by doing so, prison administrators "were able to maintain the peaceful management of the prison by reducing the tension between the staff and the prisoner without discouraging him from seeking redress of his grievances." *Griffin v. Berghuis*, 563 F. App'x 411, 416 (6th Cir. 2014), *citing Ward v. Dyke*, 58 F.3d 271, 274 (6th Cir 1995). The Sixth Circuit further explained: "[t]he ability to transfer a prisoner who is interfering with prison administration and staff morale goes to the essence of prison management." *Id*.

medical detail to be away from the dog program in Level II, he could be waived into LMF's Level IV pending a transfer to another facility. DW Potila attested:

> 7. I explained to the Plaintiff that if he received a medical detail that required him to be housed in a housing unit away from the dog program that he could, upon review, be waived for medical reasons to a Level IV housing unit at LMF pending a request for a transfer. If the MDOC housed the Plaintiff at Level IV housing unit at LMF he would not be in the same housing unit with the dog program.
>
> 8. I reviewed a form the Plaintiff filled out entitled Offender ADA Reasonable Accommodation Request/Appeal in which the Plaintiff requested an accommodation that would remove him from exposure to dogs.
>
> 9. I denied the Plaintiff's request for an accommodation because he did not have a medical detail that required him to be separated from the dog program. I did not have the authority to issue a medical detail. A medical detail had to come from a healthcare provider. It was my understanding that the Plaintiff was properly housed in Spruce Unit.

(ECF No. 34-5, PageID.369 (DW Potila's affidavit).) Warden Schroeder stated that she was aware of Miles's requests to transfer to a new unit, and she was informed by medical staff that Miles's condition did not require a transfer for medical reasons. Warden Schroeder attested:

> 7. In response to grievance LMF-20-02-0169-17I, I reached out to Physician's Assistant, Amy Westcomb. Ms. Westcomb informed me that the Plaintiff's medical condition did not warrant his removal from Spruce Unit. I responded to the Plaintiff's Step II grievance on March 9, 2020.
>
> 8. I relied on Ms. Westcomb's medical judgment.
>
> 9. No one from healthcare subsequently informed me that the Plaintiff's medical condition warranted a transfer to a different facility.

(ECF No. 34-6, PageID.373 (Warden Schroeder's affidavit).)[2]

In the opinion of the undersigned, Defendants have shown that no adverse action was taken against Miles. Rather, Defendants DW Potila and Warden Schroeder considered Miles's request to be away from the dog program, and medical personnel confirmed that he was properly placed. Defendants informed Miles that if he could get a medical detail for placement away from the LMF dog program, he would be accommodated.[3] DW Potila did not threaten to place Miles at a higher

---

[2]  Warden Schroeder responded to Miles's Step II grievance:

> I have reviewed your Step II Grievance Appeal and all information provided in your Step I Grievance. The response provided at step I partially addressed your concerns. At step II you assert again that staff at LMF are deliberately ignoring your condition while placing you in a housing unit where dogs are present. LMF Health Care has again been contacted. PA Westcomb reports that your condition is being closely monitored. PA Westcomb also reports that you are receiving treatment for your condition and that there is no issue with your placement in Spruce Unit. If you should experience any new or worsening symptoms relating to your condition contact health services immediately.

(ECF No. 34-8, PageID.383.)

[3]  Although Miles has not presented a medical detail or orders indicating that he should not be housed at a facility with a dog program, he did attach to his response brief a copy of a January 19, 2017, medical record which indicated that he had symptoms of asthma since 1991, and that "[a]ggravating factors include animals, change in weather, exercise and pollen." (ECF No. 36-3, PageID.403.)

12

security level. Instead, he told Miles he would waive him into a higher security level at LMF, if he obtained a medical detail to be away from the Level II dog program, until he could be transferred to a different facility. This accommodation was provided to Miles if he could obtain medical orders for a transfer away from the dog program that was housed in a different wing in his assigned Unit at LMF.[4] Miles cannot show that he was threatened with adverse action by DW Potila or Warden Schroeder from the explanation that he could be moved into the Level IV unit to accommodate his medical condition pending a transfer to a different facility. For these reasons, it is respectfully recommended that the Court conclude that no genuine issue of material fact exists entitling Defendants to summary judgment.

## V. Eighth Amendment

Miles asserts that Defendants violated his Eighth Amendment rights. The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of

---

[4] It is important to understand that LMF houses only Level II and Level IV prisoners.   https://www.michigan.gov/corrections/prisons/alger-correctional-facility The Level II unit includes the wing that houses the Rescue Dog Training Program. Miles was housed in a different wing of that unit. Level IV would be the only unit at LMF that did not have a dog program wing.

13

life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954. "Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347). As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.*

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)). The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37. To satisfy the objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837.

14

"[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* at 836. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

In the opinion of the undersigned, the record here shows that Defendants did not act with deliberate indifference to Miles's health condition or disregard a serious or excessive risk of harm to his condition. As set forth above, PC Pancheri had no authority to transfer Miles or to assign him to LMF. Similarly, DW Potila and Warden Schroeder did not ignore or disregard Miles's assertion that he was allergic to dog dander. They checked with medical staff to determine if Miles had a medical order for placement away from the dog program and further informed Miles to raise the issue with medical staff to see if his condition required a medical detail. (ECF No. 34-5, PageID.369 (DW Potila's affidavit) and (ECF No. 34-6, PageID.373 (Warden Schroeder's affidavit).) DW Potila further informed Miles that they would transfer him if he obtained a medical detail stating that he needed to be housed in a unit without a dog program. (ECF No. 34-5, PageID.369.) The Sixth Circuit has held that non-medical personal prison or jail staff may rely on the assessments made by medical staff. *Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009). "Where, as here, an officer responds to a substantial risk of serious harm by asking for and following

15

the advice of a professional the officer believes to be capable of assessing and addressing that risk, then the officer commits no act of deliberate indifference in adhering to that advice." *McGaw v. Sevier County*, 715 F. App'x 495, 498–99 (6th Cir. 2017). Therefore, Defendants could not have acted with deliberate indifference by seeking the advice of prison medical staff, who informed them that Miles was appropriately housed and did not need to transfer due to medical reasons, after Miles complained about his allergy to dog dander.

## VI. ADA and RA

Miles alleges that Defendants State of Michigan, MDOC, and BHCS violated his rights under the ADA and the RA. Title II of the ADA provides, in pertinent part, that no qualified individual with a disability shall, because of that disability, "be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Mingus v. Butler*, 591 F.3d 474, 481-82 (6th Cir. 2010) (citing 42 U.S.C. § 12132). To establish a claim under Title II of the ADA, a plaintiff must show:

(1) that he is a qualified individual with a disability;

(2) that defendants are subject to the ADA; and

(3) that he was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of plaintiff's disability.

*Tucker v. Tennessee*, 539 F.3d 526, 532-33 (6th Cir. 2008) *overruled in part by Anderson v. City of Blue Ash*, 798 F.3d 338, 357 n.1 (6th Cir. 2015);[5] *Jones v. City of Monroe*, 341 F.3d 474, 477 (6th Cir. 2003).

Similarly, Section 504 of the RA protects any "otherwise qualified individual" from "be[ing] excluded from the participation in, be[ing] denied the benefits of, or be[ing] subjected to discrimination" under specified programs "solely by reason of her or his disability." 29 U.S.C. § 794(a). An RA claim is based on the following elements:

> (1) that the plaintiff is a handicapped person under the Act;
>
> (2) that the plaintiff is otherwise qualified for participation in a program;
>
> (3) that the plaintiff is being excluded from participation in, being denied benefits of, or being subjected to discrimination under the program solely due to a handicap; and
>
> (4) the program or activity is receiving federal financial assistance.

*Sanderson v. Mich. High Sch. Athletic Ass'n*, 64 F.3d 1026, 1030-31 (6th Cir. 1995.) "Apart from the [Rehabilitation Act's] limitation to denials of benefits 'solely' by reason of disability and its reach of only federally funded—as opposed to 'public'—entities, the reach and requirements of both statutes are precisely the same." *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 452-453 (6th Cir. 2008) (quoting *Weixel v. Bd. of Educ.*

---

5   The third element in *Tucker* required a showing that the discrimination be "solely" because of the disability. *Tucker*, 539 F.3d at 535. *Anderson* simply removed the sole-causation requirement. 798 F.3d at 357 n. 1.

17

*of N.Y.*, 287 F.3d 138, 146 n. 6 (2d Cir. 2002)).[6]  Accordingly, ADA and RA claims may be analyzed together.  *Thompson v. Williamson Cnty*, 219 F.3d 555, 557 (6th Cir. 2000).

Defendants assert that Miles's ADA and RA claims must be dismissed because allegations that a plaintiff was denied medical treatment do not state a claim under either statute.  Miles asserts that Defendants should have transferred him to a new prison due to his assertion that he was allergic to dog dander despite medical staff indicating that he was appropriately housed for his medical condition.  However, the ADA and RA "involve discrimination for an alleged disability and not medical treatment for that disability."  *Stevenson v. Pramstaller*, No. 2:08-CV-79, 2009 WL 1883878, at *3 (W.D. Mich. June 30, 2009) (dismissing the plaintiff's ADA and RA claims where the plaintiff alleged "that he [was] not being treated for Hepatitis because he [had] Hepatitis"); *Chapman v. Franklin Cnty. Sheriff*, No. 2:22-CV-2524, 2022 WL 2915593, at *7 (S.D. Ohio July 22, 2022), *R&R adopted*, No. 2:22-CV-2524, 2022 WL 3359283 (S.D. Ohio Aug. 15, 2022) ("[A] prisoner does not state a claim for relief under the ADA for the denial of medical treatment where the claim was merely an Eighth Amendment deliberate indifference claim in another statutory guise.").  And this Court has previously determined that complaints regarding special accommodations, without evidence that that the prisoner was denied the benefits of

---

[6]  "Neither the ADA nor the RA impose liability on individuals."  *Lee v. Mich. Parole Bd.*, 104 F. App'x 490, 493 (6th Cir. 2004).  Instead, they impose liability on public entities, 42 U.S.C. § 12132, and programs receiving federal funding, 29 U.S.C. § 794.

prison services or programs,[7] constitute mere allegations of inadequate medical care not actionable under the ADA or RA. *Butler v. Scholten*, No. 1:19-CV-449, 2019 WL 4126470, at *7 (W.D. Mich. Aug. 30, 2019).

In sum, because allegations of inadequate medical treatment do not state a claim for relief under the ADA or RA, and because Miles has not provided allegations much less evidence that he was denied the benefits of prison services or programs, the undersigned respectfully recommends that the Court grant Defendants summary judgment with respect to these claims.

### VII. State Law Claims

Miles asserted state law claims under the Michigan constitution, and Michigan's Persons with Disabilities Civil Rights Act, Mich. Comp. Laws § 37.2701. In determining whether to retain supplemental jurisdiction over state law claims, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). Ordinarily, when a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are

---

[7] Take, for example, the circumstances set forth in *Douglas v. Muzzin*, No. 21-2801, 2022 WL 3088240, at *6 (6th Cir. Aug. 3, 2022). There, the plaintiff had a foot deformity and a decade-long special accommodation for orthopedic shoes, but the defendants nevertheless refused to allow the plaintiff to wear his orthopedic shoes. *Id.* at *7. Because the plaintiff could not ambulate without experiencing immense pain, he missed meals and other prison services for a period of forty-five days. *Id.* Under those circumstances, the court of appeals determined that there were genuine issues as to whether the defendants violated the ADA and RA. *Id.* at 8.

dismissed prior to trial, the court will dismiss the remaining state-law claims. *Id.* Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).

If the Court adopts the undersigned's recommendation, it will dismiss all of Miles's federal claims. The balance of the relevant considerations would therefore weigh against the exercise of supplemental jurisdiction. As such, the undersigned respectfully recommends that the Court decline to exercise supplemental jurisdiction and dismiss the Miles's state law claims as well.

## VIII.  Recommendation

Accordingly, it is recommended that the Court grant Defendants' motion for summary judgment and dismiss this case.

NOTICE TO PARTIES:  Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).

Dated:   October 31, 2024                        /s/ *Maarten Vermaat*
                                                 MAARTEN VERMAAT
                                                 U.S. MAGISTRATE JUDGE